860 F.2d 920
 19 Envtl. L. Rep. 20,251
 ANIMAL PROTECTION INSTITUTE OF AMERICA, a California
non-profit corporation; the Fund for Animals,
Inc., a New York non-profit corporation,
Plaintiffs-Appellees,
v.
Donald P. HODEL, Secretary of the United States Department
of the Interior, Washington, D.C.; Robert Buford, Director
of the Bureau of Land Management, Washington, D.C.; Edward
F. Spang, Director of the Bureau of Land Management, State
of Nevada; Thomas J. Owen, District Manager Bureau of Land
Management, Carson City; Don Pomi, Assistant District
Manager for the Division of Wild Horses and Burros; M.H.
Frei, Program Leader, Wild Horse Specialist, Defendants-Appellants.
 No. 87-2683.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1988.
Decided Oct. 31, 1988.
 
 Blake A. Watson, Appellate Section, Land & Natural Resources Div., Dept. of Justice, Washington D.C., for defendants-appellants.
 W. Craig James, Skinner, Fawcett & Mauk, Boise, Idaho, John Ohlson, Olson & Edmiston, Reno, Nev., for plaintiffs-appellees.
 Russell J. Gaspar, Hanna, Gaspar, Osborne & Birkel, Washington, D.C., for amicus.
 Appeal from the United States District Court for the District of Nevada.
 Before CHOY, CANBY, and TROTT, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 The United States Secretary of the Interior and subordinate officials ("Secretary") appeal from the district court's grant of summary judgment for the Animal Protection Institute of America, Inc. and the Fund for Animals, Inc. ("the API").[1] The district court enjoined the Secretary from transferring the titles of wild horses and burros to persons who the Secretary knows intend to use the animals for commercial purposes upon receiving title. 671 F.Supp. 695. We affirm.
 
 BACKGROUND
 
 2
 In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act ("WHA") to preserve from "capture, branding, harassment, or death" wild horses and burros found on public lands as these animals were considered "living symbols of the historic and pioneer spirit of the West" that "enrich[ed] the lives of the American people." 16 U.S.C. Sec. 1331. The WHA authorized the removal of excess wild horses and animals from public lands for private maintenance under humane conditions and care. 16 U.S.C. Sec. 1333(b) (amended 1978). Under this grant of authority, the Secretary instituted its "adopt-a-horse" program by which individuals could "adopt" wild horses or burros. See 43 C.F.R. Sec. 4740.2(b) (1977).
 
 
 3
 In 1978, as part of the Public Rangelands Improvement Act, Congress amended the WHA. The amendments set a limit of four on the number of excess animals an individual could adopt, absent a written finding by the Secretary that the individual could humanely care for more than four animals. 16 U.S.C. Sec. 1333(b)(2)(B). The amendments specified that an adopter must be a "qualified individual" who could "assure humane treatment and care" for his animals. Id. The amendments also authorized the Secretary to grant adopters title to animals if the adopters were "qualified individuals" and had humanely treated the animal or animals in their care for a year. 16 U.S.C. Sec. 1333(c).
 
 
 4
 In May 1984, the Bureau of Land Management ("BLM")[2] published regulations that allowed it to waive adoption fees for wild horses or burros that were considered "unadoptable" at the adoption fee of $125 per horse or $75 per burro. 43 C.F.R. Sec. 4750.4-2(b) (1987).
 
 
 5
 On September 11, 1985, the API filed a complaint in district court seeking declaratory and injunctive relief against the Secretary. The API claimed that the Secretary was violating the WHA in its roundup practices and maintenance of excess wild horses and burros, and in its adoption procedures for excess animals. The API alleged a statutory basis for its lawsuit under the Administrative Procedure Act, which allows a party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review. 5 U.S.C. Sec. 702.
 
 
 6
 The parties eventually signed a stipulation settling the claims concerning the roundup and maintenance of wild equids. The dispute concerning adoption procedures remained unresolved. The API alleged that the Secretary's fee-waiver adoption program violated congressional intent under the WHA by facilitating the commercial exploitation[3] of wild horses and burros. Specifically, the API claimed that entrepreneurs used the fee-waiver program in conjunction with the granting of powers of attorney to secure title to wild equids for commercial purposes.[4] On cross-motions for summary judgment, however, the API limited its claim for relief to situations in which the Secretary transfers title to adopters knowing that they intend to use the animals for commercial purposes once they receive title.[5] The district court subsequently granted the API injunctive relief, holding that when the Secretary has actual knowledge that an adopter intends to commercially exploit animals upon receipt of legal title, the Secretary may not transfer title to that adopter. The Secretary timely appeals.
 
 DISCUSSION
 I. Standing
 
 7
 The Secretary attacks the API's standing for the first time on appeal. Standing is a necessary element of federal court jurisdiction, and we must determine that standing exists, even though the issue was not raised below. See Bender v. Williamsport Area School District, 475 U.S. 534, 546-47, 106 S.Ct. 1326, 1334, 89 L.Ed.2d 501 (1986).
 
 
 8
 The constitutional requirement of standing, discerned from Article III's "case" or "controversy" requirement, entails that a litigant allege: "(1) a personal injury, (2) which is fairly traceable to the defendant's allegedly unlawful conduct, and (3) which is likely to be redressed by the requested relief." Alaska Fish & Wildlife Federation v. Dunkle, 829 F.2d 933, 937 (9th Cir.1987) (citing Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)), cert. denied, --- U.S. ----, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988).
 
 
 9
 In the present case, the Secretary contests the API's ability to satisfy the first requirement. The Secretary argues that neither the API nor its members have suffered or are in danger of suffering an injury-in-fact.
 
 A. Injury-in-Fact
 
 10
 An association has standing to sue for injuries to its members. See Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); Animal Lovers Volunteer Ass'n, Inc. (ALVA) v. Weinberger, 765 F.2d 937, 938 (9th Cir.1985). Cognizable injuries include harm to aesthetic interests and environmental well-being. United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 702, 93 S.Ct. 2405, 2423, 37 L.Ed.2d 254 (1973).
 
 
 11
 The API asserted in its complaint that the improper removal and injury of wild horses and burros will cause irreparable injury to its members who use and enjoy the public lands that the equids inhabit. Yet, as the Secretary notes, the API's claim concerns not the management and treatment of wild horses and burros on the range, but the disposal of animals already removed from the range. The fate of these animals will not impact on the members' use and enjoyment of public lands. Hence, the members can allege no injury to their aesthetic interests. See ALVA, 765 F.2d at 938 (no injury to the association's members from the Navy's shooting of wild goats on land not open to the public).
 
 
 12
 However, API members have a special interest in monitoring the well-being of wild horses and burros removed from the range and kept in BLM holding facilities. An agreement between the Secretary and the API gives API members the right to inspect wild equids maintained in the BLM pens in order to insure that the animals receive humane treatment.[6] The Secretary's practice at issue in this lawsuit frustrates this right, because it removes from BLM pens for commercial exploitation animals which would otherwise be monitored by the API members.
 
 
 13
 The Secretary denies that its transfer of animals to adopters who will put the animals to commercial use constitutes an injury. The Secretary notes that under BLM regulations only those animals otherwise unadoptable are eligible for adoption under the fee-waiver program. 43 C.F.R. Sec. 4750.4-2(b) (1987).[7] Therefore, since he is statutorily required to humanely destroy unadoptable animals, see 16 U.S.C. Sec. 1333(b)(2)(C), the Secretary reasons that the removal and destruction of animals that are subject to the fee-waiver program is assured in any event.
 
 
 14
 This argument does not address the injury to the API members' interest in insuring that the animals receive humane treatment while kept in BLM pens. Moreover, this argument does not address the scenario in which the Secretary allows adoptions by persons who pay value for the animals and intend to commercially exploit them. Finally, in granting funds to the BLM for fiscal year 1988, Congress stated that the money appropriated "shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the [BLM] or its contractors." Department of the Interior & Related Agencies Appropriations Act of 1988, Pub.L. No. 100-202, 101 Stat. 1329-214 (Dec. 22, 1987). The Department of the Interior appropriations bill for fiscal year 1989 contains the identical restriction on the use of funds. See H.R. 4867, 100th Cong., 2d Sess., 134 Cong.Rec. S9450 (daily ed. July 13, 1988).[8] Thus, at the present time, Congress clearly is determined to prevent the Secretary from exercising his authority to destroy healthy excess animals under 16 U.S.C. Sec. 1333(b)(2)(C).[9]
 
 
 15
 B. The Remaining Constitutional Requirements of Standing
 
 
 16
 It is evident that the requested relief, the prohibition of the transfer of title to adopters who intend to commercially exploit animals, is traceable to the Secretary's practice of ignoring the expressed intent of adopters. Likewise, the requested relief will redress the alleged injury stemming from the commercial use of wild equids.[10]
 
 II. Congressional Intent
 
 17
 We review de novo a grant of summary judgment. Parola v. Weinberger, 848 F.2d 956, 958 (9th Cir.1988). We also review de novo a district court's interpretation of statutes. Id. However, "[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985). Yet, "[t]he judiciary is the final authority on issues of statutory construction...." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). Thus, this court " 'must reject administrative constructions of [a] statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.' " Securities Industrial Ass'n v. Board of Governors of the Federal Reserve System, 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984) (quoting Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)).
 
 
 18
 Discernment of congressional intent begins with a review of the relevant statutory language and then proceeds to consider pertinent legislative history and other relevant interpretive aids. Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 13, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981). Furthermore, a statute that "is part of an organic whole ... should be viewed in context with the whole of which it is a part." United States v. Hells Canyon Guide Service, Inc., 660 F.2d 735, 737 (9th Cir.1981); see also Pacific Mutual Life Insurance Co. v. American Guaranty Life Insurance Co., 722 F.2d 1498, 1500 (9th Cir.1984).
 
 A. Statutory Language
 
 19
 To prevent the ruinous overpopulation of public lands by wild horses and burros, Congress has authorized the Secretary to remove "excess animals from the range." 16 U.S.C. Sec. 1333(b)(2). The Secretary must humanely destroy "old, sick, or lame" excess animals. 16 U.S.C. Sec. 1333(b)(2)(A). The healthy excess animals remain eligible for adoption by private parties if the Secretary determines that the prospective adopters are "qualified individuals" and the Secretary determines that these individuals "can assure humane treatment and care" for the animals. 16 U.S.C. Sec. 1333(b)(2)(B). After taking care of the animals for a year, adopters may receive legal title to the animals if the Secretary determines that in the interim the adopters have remained "qualified individuals" and have provided "humane conditions, treatment and care" for the animals. 16 U.S.C. Sec. 1333(c). Upon transfer of title, the animals no longer fall within the provisions of the WHA. 16 U.S.C. Sec. 1333(d)(1).
 
 
 20
 The Secretary interprets this statutory scheme as imposing only one precondition on adopters for receiving title: adopters must provide humane treatment and care for one year. After this year period, the Secretary may transfer title even if he knows beforehand that once the adopters receive title, they will put the animals to commercial use.
 
 
 21
 However, section 1333(b)(2)(B) instructs the Secretary to make the initial determination that adopters are both "qualified individuals" and persons who "can assure humane treatment and care." Section 1333(c), in authorizing the transfer of title to adopters, requires the Secretary to insure that an adopter who seeks title remains a "qualified individual" and one who "has provided humane conditions, treatment and care" for the animals he has maintained. This language indicates that an adopter's assurance of humane treatment and care is not enough to warrant transfer of title; the adopter must also be a qualified individual. Viewed in light of the WHA's other statutory provisions that explicitly forbid the commercial exploitation of wild equids, see 16 U.S.C. Secs. 1333(d)(5); 1338(a)(4), and strive to insure their humane treatment, see 16 U.S.C. Secs. 1333(b)(2), 1333(c), 1338(a)(3), 1338a, it would be unreasonable to maintain that Congress intended a qualified individual to include a person who has expressed an intent to commercially exploit these "living symbols of the historic and pioneer spirit" that "enrich the lives of the American people." See 16 U.S.C. Sec. 1331.
 
 B. Legislative History
 
 22
 A review of the legislative history confirms the assessment that the Secretary's position contravenes congressional intent. The Senate report that accompanied the enactment of the WHA[11] stated that:
 
 
 23
 [Wild horses and burros] have been cruelly captured and slain and their carcasses used in the production of pet food and fertilizer. They have been used for target practice and harassed for "sport" and profit. In spite of public outrage, this bloody traffic continues unabated, and it is the firm belief of the committee that this senseless slaughter must be brought to an end.
 
 
 24
 S.Rep. No. 242, 92d Cong., 1st Sess. 1-2, reprinted in 1971 U.S.Code Cong. & Admin.News 2149-50. The report noted that "[i]t is the expressed intent of the committee to remove the possibility of monetary gain from exploitation of these animals." Id. at 4, reprinted in 1971 U.S.Code Cong. & Admin.News 2152. See 117 Cong.Rec. S44537 (1971) (statement of Sen. Dole); 117 Cong.Rec. H34772 (1971) (statements of Rep. Aspinal and Rep. Wiggins).
 
 
 25
 Upon passage of the 1978 amendments to the WHA, the accompanying House report stated that:
 
 
 26
 In 1971, Congress passed legislation to protect wild and free-roaming horses and burros from indiscriminate capture, branding, harassment and death. This legislation was necessary to correct intolerable abuses of these animals by those seeking to exploit them for private use and profit. Particularly objectionable were several cruel practices of rounding up, and then slaughtering animals for sale to processing plants for horse meat.
 
 
 27
 1978 House Report at 21. The House report noted that unfortunately the 1971 legislation had worked too well so that now the numbers of wild horses and burros exceeded the carrying capacity of the range and "pose[d] a threat to wildlife, livestock, the improvement of range conditions, and ultimately their own survival." Id. To correct this problem, the 1978 legislation sought to make adoption more attractive to "responsible parties" by allowing the adopter to receive legal title to his animal or animals. Id. at 22, 23. Testimony in prior congressional hearings had indicated that failure to allow transfer of title was an "inhibiting factor," for persons with "appropriate facilities [were] less anxious to make application and undergo considerable expense in caring for horses or burros that they cannot own." The Wild Free-Roaming Horses and Burros Act: Hearings before the Subcomm. on Public Lands of the Senate Comm. on Energy and Natural Resources on the Public Rangelands Improvement Act of 1978, 95th Cong., 2d Sess. 26 (1978) (statement of Guy Martin, Assistant Secretary, Land and Water Resources, Dept. of the Interior); see id. at 14 (statement of Nevada Senator Paul Laxalt).
 
 
 28
 Yet, Congress was also aware of complaints of abuse in the adoption process, including allegations of inhumane treatment after adoption. See 1978 House Report at 21-22. The 1978 amendments were designed in part to address these concerns by providing protection against the inhumane treatment of excess animals after adoption. See Id. at 22 (adoption "to be more stringently controlled than in the past"); 124 Cong.Rec. H19501 (1978) (statement of Rep. Roncalio) (legislation "increases safeguards to insure that excess animals which are put up for adoption are humanely treated during roundup and after adoption"); 124 Cong.Rec. H19506-07 (1978) (statements of Rep. Panetta and Rep. Marlene) (legislation improves the adoption program by ensuring that the animals "find good, new homes with responsible individuals").
 
 
 29
 The one-year wait for transfer of title was intended to act as a safeguard to insure humane treatment by establishing a probationary period for adopters.[12] See 124 Cong.Rec. S32808 (1978) (statement of Sen. Cannon) (legislation permits transfer of animals "following a 1-year probation period and assurance that the animals have been humanely treated"). Indeed, BLM officials have testified that this one-year restriction constitutes a period of probation. See Adopt-A-Horse Program: Hearing before the Subcomm. on Governmental Efficiency and the District of Columbia of the Comm. on Governmental Affairs, 96th Cong., 1st Sess. 17 (1979).[13]
 
 
 30
 Legislative history thus reveals that Congress intended the one-year wait for title transfer to act as a probationary period that would weed out unfit adopters. The Secretary's disregard for the announced future intentions of adopters undercuts Congress' desire to insure humane treatment for wild horses and burros. In fact, it renders the adoption process a farce, for the one-year requirement of humane treatment and care serves no purpose if on the day the one-year period expires, the adopter can proceed to the slaughterhouse with his horses or burros.
 
 III. The Use of Powers of Attorney
 
 31
 The API indicates for the first time in its brief that it is contesting the Secretary's practice of allowing adopters to use powers of attorney. See supra footnote 4.
 
 
 32
 Federal appellate courts generally do not consider issues first raised on appeal. Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). However, we will review an issue for the first time on appeal under certain circumstances, such as when the issue is a legal one, not necessitating additional development of the record, see In re Howell, 731 F.2d 624, 627 (9th Cir.), cert. denied, 469 U.S. 933, 105 S.Ct. 330, 83 L.Ed.2d 266 (1984); or when review will prevent "manifest injustice," see Lien Ho Hsing Steel Enterprise Co. v. Weihtag, 738 F.2d 1455, 1461 (9th Cir.1984), or when there is "clear error," see Aguon v. Calvo, 829 F.2d 845, 848 (9th Cir.1987).
 
 
 33
 Here, no circumstances support suspending the application of the general rule disfavoring review of issues first raised on appeal. Though the use of powers of attorney presents a legal issue, the parties did not argue this issue below, and the record is not fully developed. The API cannot allege manifest injustice as it has shown no reason for failing to address this issue below.[14] See International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985). Finally, the use of powers of attorney is separate from the issue of commercial exploitation and not a clear violation of the Secretary's authority.
 
 
 34
 Moreover, the API filed no cross-appeal, which is generally a prerequisite for an appellee who seeks alteration of a judgment to enlarge the relief granted by the trial court. See Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed.2d 593 (1937); United States v. One 1964 MG, Serial No. 64GHN3L34408 Washington License No. DFY 260, 584 F.2d 889,890 (9th Cir.1978).
 
 CONCLUSION
 
 35
 The API has standing. Its members have a protectible interest in monitoring the treatment of wild horses and burros in the BLM holding facilities. The Secretary's transfer of animals for commercial purposes injures this interest.
 
 
 36
 With respect to the merits, the Secretary's practice of transferring title to adopters who the Secretary knows will commercially exploit the animals they adopt contravenes congressional intent. The issue concerning the Secretary's allowance of powers of attorney has not been properly presented and thus is not reviewed. Accordingly, we AFFIRM the district court's judgment.[15]
 
 
 
 [1]
 The American Horse Protection Association, Inc., has filed an amicus brief on behalf of the API
 
 
 [2]
 The BLM is the agency within the Department of the Interior through which the Secretary of the Interior administers public lands. See Reorg.Plan No. 3 of 1946, Part IV, 5 U.S.C. app. at 1031; 16 U.S.C. Sec. 1332(a)
 
 
 [3]
 Commercial exploitation encompasses the use of animals as bucking horses in rodeos and the slaughter of animals for processing into pet food
 
 
 [4]
 In their briefs, both parties acknowledge the existence of this scheme by which individual adopters, each of whom adopts or takes title to no more than four animals, grant one person a power of attorney. This person with the power of attorney maintains the animals for the adopters. See 43 C.F.R. Sec. 4750.3-3 (1987). Upon passage of title, the restrictions set forth by the WHA no longer apply. 16 U.S.C. Sec. 1333(d)(1). Thus, after title has passed, the person with the power of attorney can, with the consent of the adopters, put the animals to commercial use
 
 
 [5]
 The parties stipulated that there have been instances where the Secretary transferred title with knowledge that the person receiving title planned to commercially exploit the animals
 
 
 [6]
 The API did not identify this right in its complaint, but the agreement is part of the record. Since the Secretary did not raise the question of standing in the district court, we allow the API to cite to the record to supply the necessary factual allegations to support standing. See Center for Auto Safety v. National Highway Traffic Safety Administration, 793 F.2d 1322, 1330 n. 45 (D.C.Cir.1986); see also Bender, 475 U.S. at 547, 106 S.Ct. at 1334 (Where standing was not raised below and the complaint failed to establish standing, the Court reviewed the record to decide the issue.)
 
 
 [7]
 Prior to oral argument, the Secretary informed this court of proposed congressional legislation that would disable the BLM's fee-waiver program. See H.R.Conf.Rep. No. 862, 100th Cong., 2d Sess. 8 (1988) (in recommending appropriations for the Department of the Interior for fiscal year 1989, the conferees have agreed that "no funding [be] provided for the fee waiver adoption program"). The Secretary has also apprised this court of the BLM's recent decision to discontinue the fee-adoption program. However, these developments do not render this case moot because animals previously adopted under the fee-waiver program will become eligible for titling after the one-year probation period. In addition, the district court's injunction applies not only to adopters under the fee-waiver program, but also to those who pay value for their animals
 
 
 [8]
 This bill recently passed the House and Senate. See 134 Cong.Rec. H7239, S12010 (daily ed. Sept. 8, 1988). It was signed by the President on September 27, 1988
 
 
 [9]
 In fact, it appears the Secretary has never exercised his statutory right to destroy healthy excess animals. The House report that accompanied the 1978 amendments noted that "[a]lthough the 1971 law gives the [Secretary] the authority to destroy ... excess animals, pressure from segments of the public and from horse protective and humane organizations has led the Secretar[y] to reject this option of dealing with overpopulation." H.R.Rep. No. 1122, 95th Cong., 2d Sess. 21 (1978) [hereinafter 1978 House Report]
 
 
 [10]
 In addition to the constitutional component, standing incorporates prudential considerations, "such as the general prohibition on a litigant's raising of another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen, 468 U.S. at 751, 104 S.Ct. at 3324
 No prudential considerations mitigate against granting the API standing. The API does not raise another's legal rights and has presented a specific grievance appropriate for judicial resolution. Further, insuring humane treatment for wild equids lies within the zone of interests protected by the WHA. See infra pt. II.
 
 
 [11]
 With minor amendments, the Senate bill was passed in lieu of the house bill. See H.R.Conf.Rep. No. 681, 92d Cong., 2d Sess., reprinted in 1971 U.S.Code Cong. & Admin.News 2159-61
 
 
 [12]
 The limit of four horses per adopting party was another major check on adoption abuses. See H.R.Rep. No. 1122, 95th Cong., 2d Sess. 22 (1978); 124 Cong.Rec. S35093 (1978) (statement of Sen. Udall)
 
 
 [13]
 While not named in the present lawsuit, the Secretary of Agriculture is also subject to the WHA for public lands he administers through the Forest Service, see 16 U.S.C. Sec. 1332(a), and has indicated that the one-year term is a "probationary period." S.Rep. No. 1237, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Admin.News 4116-17 (letter from the Secretary of Agriculture to the Chairman of the Senate Committee on Energy and Natural Resources)
 
 
 [14]
 In fact, at the hearing on the cross-motions for summary judgment, the API's counsel expressly disavowed any intent to contest the Secretary's allowance of powers of attorney
 
 
 [15]
 In accordance with the district court's decision, we note that the scope of the injunction covers only those situations in which the Secretary has actual knowledge of an adopter's intent to use animals for commercial purposes and does not address whether the Secretary has an affirmative duty to ascertain an adopter's intent