903 F.2d 612
 58 USLW 2665, 1990-1 Trade Cases 69,013
 IMAGE TECHNICAL SERVICE, INC., a California corporation;
J-E-S-P Company, Inc., a New Jersey corporation; Shields
Business Machines, Inc., a Pennsylvania corporation;
Micrographic Services, Inc., a Missouri corporation; Micro
Maintenance, Inc., an Illinois corporation; Atlanta General
Microfilm Co., Inc., a Georgia corporation; Roger Katona,
doing business as G. & S. Electronics; Amtech Equipment
Maintenance, Inc., a Minnesota corporation; Advanced
Systems Services, Inc., a Colorado corporation; B.C.S.
Technical Services, Inc., a Colorado corporation; Bob
Ingle, Inc., a Missouri corporation; Data Prox Equipment
Co., a New Jersey corporation; Fisher Micrographics, Inc.,
a Missouri corporation; I.O.A. Data Corp., a New York
corporation; Searle Enterprises, doing business as Micro
Image, Inc.; Midwest Microfilm Equipment & Service, Inc., a
Minnesota corporation; Omin Micrographic Services, Inc.;
and CPO, Ltd., a California corporation, Plaintiffs-Appellants,
v.
EASTMAN KODAK CO., a New Jersey corporation, Defendant-Appellee.
 No. 88-2686.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1989.
Decided May 1, 1990.
 
 James A. Hennefer, Law Offices of James A. Hennefer, San Francisco, Cal., for plaintiffs-appellants.
 Donn P. Pickett, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before CHAMBERS, WALLACE and WIGGINS, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 Appellants are independent service organizations, or ISOs, that service copier and micrographic equipment manufactured by appellee Eastman Kodak Co. They appeal summary judgment dismissing their antitrust claims against Kodak. We reverse and remand.
 
 
 2
 At the heart of this case are two of Kodak's business policies: First, Kodak will not sell replacement parts for its equipment to Kodak equipment owners unless they agree not to use ISOs. Second, Kodak will not knowingly sell replacement parts to ISOs. Kodak admits that the purpose of these policies is to prevent ISOs from competing with Kodak's own service organization for the repair of Kodak equipment.
 
 
 3
 On appeal, appellants argue that they raised triable issues concerning: (1) whether Kodak's refusal to sell parts to equipment owners unless they agree not to use ISOs constitutes a tying arrangement violative of Section 1 of the Sherman Act; and (2) whether Kodak's refusal to sell parts to ISOs is an act of monopolization violative of Section 2 of the Sherman Act.
 
 
 4
 We have jurisdiction under 28 U.S.C. Sec. 1291 (1982). We review the district court's grant of summary judgment de novo. Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir.1987). We must determine, viewing the evidence in the light most favorable to appellants, whether issues of material fact exist and whether the district court correctly applied the relevant substantive law. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986).
 
 
 5
 Viewed in the light most favorable to appellants, the facts are as follows: Prior to 1982, Kodak serviced almost all of its micrographic and copier equipment. Kodak would sell replacement parts (at a profit) to any party who intended to use them to repair Kodak equipment. ISOs generally do not manufacture the replacement parts they use in providing equipment service. ISOs do, however, maintain regular inventories of such parts. In reliance on Kodak's practice of freely selling replacement parts, ISOs developed and began to compete significantly with Kodak in 1984 and 1985. ISOs offered service for as little as half of Kodak's price. To better compete, Kodak in some cases cut its price for service. Some customers found ISO service superior to Kodak service.
 
 
 6
 Concerned with ISO competition, Kodak reviewed its replacement parts policies in 1985 and developed its current policies of not selling replacement parts to ISOs or to customers who use ISOs. Kodak exempted micrographic equipment manufactured before 1985 from these new policies. Since 1985, Kodak has had difficulty identifying ISOs and customers who use ISOs. Kodak, therefore, unknowingly sold parts to ISOs and customers who use them since it implemented the 1985 policies. Kodak is currently attempting to enforce more effectively its policies.
 
 I. The Tying Claim
 
 7
 Section 1 of the Sherman Act declares illegal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. Sec. 1 (1982). The Supreme Court has consistently interpreted this provision to prohibit only unreasonable restraints of trade. Business Elec. Corp. v. Sharp Elec. Corp., 485 U.S. 717, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). Appellants contend that they have presented genuine issues for trial as to whether Kodak's refusal to sell spare parts to equipment owners unless they agree not to use ISOs constitutes a tying arrangement per se unreasonable under this section.[1]
 
 
 8
 A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (emphasis added, footnote omitted). A tying arrangement is per se unreasonable if the defendant has sufficient economic power in the tying product market to restrain competition appreciably in the tied product market and if the arrangement affects more than an insubstantial volume of interstate commerce in the tied product.[2] Fortner Enterprises, Inc. v. U.S. Steel Corp., 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969); Mozart Co. v. Mercedes-Benz of N. Am., Inc., 833 F.2d 1342, 1345 (9th Cir.1987), cert. denied, --- U.S. ----, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988); General Business Systems v. North American Philips Corp., 699 F.2d 965, 977 (9th Cir.1983).
 
 
 9
 The district court held that appellants failed to show evidence of a tying arrangement, noting that Kodak does not "condition the sale of one product on the buyer's purchase of another product" since a "Kodak customer can buy equipment without having to buy parts; and he can buy parts if he simply owns Kodak equipment." Image Technical Services, Inc. v. Eastman Kodak Co., No. C-87-1686-WWS, at 5, 1988 WL 156332 (N.D.Cal. Apr. 18, 1988) (Memorandum of Opinion and Order Granting Summary Judgment). Appellants argue that the district court misconstrued one of their theories, explicitly presented in their memorandum in opposition to Kodak's motion for summary judgment. This theory is that Kodak has tied parts to service, not equipment to parts or parts to equipment.
 
 
 10
 Kodak responds that even viewed as appellants suggest, its policy is not a tying arrangement. First, Kodak points out, it does not force owners to buy service in order to receive parts; Kodak only requires owners not to buy ISO service to receive parts. Kodak will sell parts to owners who agree to self-service their machines. Kodak, however, misconceives the nature of tying agreements. As we stated above, a tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Northern, 356 U.S. at 5-6, 78 S.Ct. at 518 (emphasis added; footnote omitted).
 
 
 11
 Second, Kodak argues that its policy is not a tying arrangement because parts and service form a single product market, and without two distinct markets there can be no tying arrangement. See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 21, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2 (1984). The critical question in determining whether two distinct product markets exist is whether it is economically efficient to offer two products separately. Id. at 21-22, 104 S.Ct. at 1562-63. That, in turn, depends on whether the demand for each can be separated. Id. Kodak contends that there is no separate demand for parts and service. Indeed, Kodak contends, they are useless without each other. Consequently they are economically inseparable.
 
 
 12
 Kodak's argument presents, at best, a disputed issue of fact. That products must be used together does not eliminate the possibility that they form distinct markets. "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." Id. at 19 n. 30, 104 S.Ct. at 1562 n. 30 (citing cases). Kodak's policy of allowing customers to purchase parts on condition that they agree to service their own machines suggests that the demand for parts can be separated from the demand for service. Kodak does not dispute appellants' claim that some equipment owners have (perhaps surreptitiously) bought service from ISOs and parts from Kodak. Nor does Kodak dispute appellants claim that other equipment owners would have contracted with ISOs for service if they could have obtained parts separately. Cf. Dimidowich v. Bell & Howell, 803 F.2d 1473, 1480 n. 3 (9th Cir.1986) (applying California law) (noting that for some products, such as automobiles, the parts market is distinct from the service market), modified 810 F.2d 1517 (9th Cir.1987); Digidyne Corp. v. Data General Corp., 734 F.2d 1336, 1339 (9th Cir.1984), cert. denied, 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985) (holding that separate markets existed for computer central processing unit and computer operating system).
 
 
 13
 Having established that a tying arrangement might exist, we next consider whether, assuming that such a tying arrangement exists, there is an issue of material fact as to whether Kodak has sufficient economic power in the tying product market to restrain competition appreciably in the tied product market. To determine such market power, courts commonly consider whether the defendant is able to force or to induce some potential tying-product customers (here potential Kodak parts customers) to purchase the tied product (here Kodak service) that these customers would not purchase absent the tying arrangement. Jefferson Parish, 466 U.S. at 12-18, 104 S.Ct. at 1558-61; Mozart, 833 F.2d at 1345; Digidyne, 734 F.2d at 1339-41. The district court did not decide this issue.
 
 
 14
 Appellants suggest that Kodak does have power in the parts market for two interdependent reasons. First, many Kodak parts are unique and available only from Kodak. See Jefferson Parish, 466 U.S. at 17, 104 S.Ct. at 1560 (explaining that a defendant may have market power if he offers a unique product that others are unable to offer). Second, owners of Kodak machinery cannot readily switch to other companies' machinery (thereby obviating the need for Kodak parts). Once one owns Kodak's expensive machinery, appellants argue, he is locked in to it. See Digidyne, 734 F.2d at 1342 (discussing how market power can be enhanced by customer lock-in).
 
 
 15
 Kodak counters, first, that it does not have market power in the interbrand markets for copier or micrographic equipment.[3] Thus, Kodak argues, it cannot have market power in the after-market for spare parts. Kodak points out that appellants do not dispute that equipment purchasers consider the cost of parts and service when initially deciding between Kodak's equipment and its competitors' equipment. If Kodak were to charge supercompetitive prices for parts and service, equipment purchasers would buy competitors' equipment. Second, Kodak argues that appellants have failed to present sufficient evidence that its equipment owners cannot economically replace their current equipment.
 
 
 16
 We believe that competition in the interbrand markets might prevent Kodak from possessing power in the parts market. To be sure, this case is distinguishable from those in which the defendants had tied parts to equipment. In those cases, since equipment was the tying product, interbrand competition in the equipment market readily negated the plaintiffs' claims that the defendants possessed power in the tying product market. See, e.g., Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792 (1st Cir.1988) (tying of cars to parts). In this case, Kodak has tied parts to service, not equipment to parts. Interbrand competition in the equipment market does not in the abstract negate appellants' claim that Kodak has power in the parts market. See Dimidowich, 803 F.2d at 1480 n. 3 (pointing out that an owner of a broken piece of Bell and Howell micrographic equipment cannot turn to people who service only Kodak or 3M equipment).
 
 
 17
 But just as equipment purchasers would turn to one of Kodak's competitors if Kodak tied supercompetitively priced parts or service directly to equipment, equipment purchasers might turn to one of Kodak's competitors if Kodak ties supercompetitively priced service to parts. Kodak's desire to attract new customers might, therefore, keep it from charging supercompetitive prices for service. As we stated in a case involving a computer company's alleged tying of service and warranty protection to computer hardware, "To have attempted to impose significant pressure to buy [computer parts] by use of the tying service only would have hastened the date on which [defendant] surrendered to its competitors in the small business computer market." Philips, 699 F.2d at 977; see also Parts and Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 236 (7th Cir.1988) (Posner, J. dissenting) (suggesting, in the context of a tie of parts to motors, that market forces will keep a company that lacks interbrand market power from charging supercompetitive prices in the parts market), cert. denied, --- U.S. ----, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989).
 
 
 18
 Nevertheless, we cannot uphold the district court's grant of summary judgment on this theoretical basis. Not only do we lack the benefit of the district court's consideration of the market power issue, we are presented with a record that was not fully developed through discovery on this issue.[4] Furthermore, market imperfections can keep economic theories about how consumers will act from mirroring reality. See Jefferson Parish, 466 U.S. at 15 n. 24, 104 S.Ct. at 1560 n. 24 (noting that market imperfections can keep consumers from seeing the price and quality implications of a tying arrangement). While appellants have not conducted a market analysis and pin-pointed specific imperfections in the copier and micrographic markets, a requirement that they do so in order to withstand summary judgment would elevate theory above reality. It is enough that appellants have presented evidence of actual events from which a reasonable trier of fact could conclude that Kodak has power in the interbrand market and that competition in the interbrand market does not, in reality, curb Kodak's power in the parts market. For example, appellants have presented evidence that Kodak charges up to twice as much as appellants for service that is of lower quality than appellants' service. Appellants presented evidence that in some instances competition from ISOs drove down the price that Kodak was willing to charge for service and that in other instances some owners of large Kodak equipment packages will pay higher prices for Kodak service rather than switch to competitors' systems. See Fortner, 394 U.S. at 503-04, 89 S.Ct. at 1258-59 (a price differential may suggest market power).
 
 
 19
 Appellants' evidence distinguishes this case from Philips. In that case, involving a district court's proper summary judgment for a defendant on a tying claim based upon a lack of market power, we explicitly found that the plaintiff had "not presented facts from which [market power] could be inferred." Philips, 699 F.2d at 977. For example, in contrast to the situation in this case, it appeared uncontroverted that the higher price for the tied product was due to the product's greater reliability. See Philips, 699 F.2d at 969, 972-73, 97778. The tied product did not go down in price after the tying arrangement ceased. Id. at 977.
 
 
 20
 There also appears to have been no evidence that Philips was the exclusive source of service for Philips computers, the tying product. But appellants have presented evidence that many Kodak parts, the tying product, are unique and available only from Kodak.
 
 
 21
 Furthermore, Philips' share of the interbrand computer market never exceeded five percent. Id. at 969. At the time of Philips' alleged tying arrangement, Philips' share of the interbrand market was declining as Philips' computers were "threatened ... with obsolescence." Id. at 970. Roughly one year into the lawsuit, Philips withdrew completely from the American computer market. Id. at 969-70. By contrast, Kodak's share of the interbrand copier and micrographic equipment markets varies and may approach as much as twenty-three percent. See ante at 616, n. 3. Far from being threatened with obsolescence, Kodak's equipment is state of the art.
 
 
 22
 Granted, appellants have not claimed that these factors are sufficient to give Kodak power in its interbrand markets. But just as market share is not alone determinative of market power, cf. Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1204 (9th Cir.1975) (market share is not determinative of monopoly power), cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976), power in the interbrand market is not the only basis for power in the parts market. Some strength in the interbrand market, although short of actual market power, can combine with other factors to yield power in an after-market. We, therefore, believe that the contrast between Kodak's and Philips' strength in their interbrand markets is another indication of a difference in power in their after-markets. Cf. Sterling, 866 F.2d at 236 (Posner, J., dissenting) (defendant's market share was one-tenth of one percent).
 
 
 23
 Viewed in the light most favorable to appellants, the evidence that they have presented is sufficient to raise a material issue of fact as to whether Kodak has power in the parts market.
 
 
 24
 Kodak also contends that it has legitimate business reasons for refusing to sell parts to equipment owners who use ISOs. This court has held that a tying arrangement "does not violate the antitrust laws 'if implemented for a legitimate business reason and if no less restrictive alternative is available.' " Mozart, 833 F.2d at 1349 (citing Phonetele, Inc. v. American Tel. & Tel. Co., 664 F.2d 716, 739 (9th Cir.1981)). Kodak contends that it implemented its parts policies for three legitimate business reasons: (1) To guard against inadequate service, which reflects negatively on Kodak because customers cannot differentiate between bad service and bad equipment; (2) to remove inventory costs, which Kodak incurs in supplying replacement parts to non-users of Kodak service; (3) to prevent ISOs from free-riding on Kodak's investment in the copier and micrographic industry.
 
 
 25
 Appellants argue that Kodak's proffered reasons are pretextual or insufficient. Once again, the district court did not discuss this aspect of the case and we cannot say as a matter of law that Kodak's proffered reasons for its policies are genuine and sufficient. To prevail on the basis of its first reason, Kodak would have to prove[5] that its tying arrangement is the only way that highest quality service can be assured. See id. at 1350 & n. 7. But appellants have presented evidence that their service is superior to Kodak service. Furthermore, appellants have presented evidence from which a reasonable trier of fact could conclude that Kodak's first reason is pretextual. For example, appellants have presented evidence that Kodak for the first time refused to sell parts to appellant Image Technical Services, Inc. just two months after Image, in competitive bidding against Kodak, won contracts with the state of California. Triable issues of fact surround Kodak's first reason.
 
 
 26
 A reasonable trier of fact could also conclude that Kodak's second reason is pretextual. A reasonable trier of fact need not accept Kodak's assertion that not selling parts to equipment owners who use ISOs will reduce its inventory costs. A reasonable trier of fact could conclude that equipment owners' need for Kodak-supplied parts is determined only by the frequency of equipment failure. Indeed, Kodak's policy is based on the premise that equipment owners will have to buy replacement parts from Kodak, even if it means not using ISOs. Thus, triable issues of fact surround Kodak's second reason.
 
 
 27
 As a matter of law, Kodak's third reason cannot justify its policy. Kodak believes that if ISOs are to compete with it, they should be required to overcome the barriers to entering the parts market as well as the barriers to entering the service market. But one evil of a tying arrangement is precisely that it creates an entry barrier for potential competitors by requiring them to enter two product markets simultaneously. Fortner, 394 U.S. at 509, 89 S.Ct. at 1261. For this reason, "recovery of investment costs has been explicitly excluded from the narrowly-construed exceptions to the per se rule against tie-ins." Digidyne, 734 F.2d at 1343-44 (quoting In re Data General Corp. Antitrust Litigation, 490 F.Supp. 1089, 1122 (N.D.Cal.1980). As a matter of law, therefore, it is a less restrictive alternative for Kodak to structure its prices for equipment, parts, and service so that the price for which Kodak sells each of these reflects Kodak's investment costs in that area. Id. at 1344 (citing United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961)).
 
 
 28
 Finally, Kodak suggests that it acted unilaterally in tying parts to service. It is true that independent action is not proscribed by Section 1 of the Sherman Act. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). But Kodak entered into agreements with its equipment owners, expressly set out in its "Terms of Sale," that it will sell parts only to users "who service only their own Kodak equipment." If such conduct were to be labelled "independent," virtually all tying arrangements would be beyond the reach of Section 1. We do not believe that Monsanto, without discussing the courts' tying decisions, meant to overturn them.
 
 
 29
 The district court improperly granted summary judgment on the Section 1 claim.
 
 II. The Refusal to Deal Claim
 
 30
 Section 2 of the Sherman Act makes it illegal for any person to "monopolize, or attempt to monopolize, ... any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. Sec. 2 (1982). For a person to be guilty of monopolization, he must (1) possess monopoly power in the relevant market; and (2) wilfully engage in conduct designed to maintain that power improperly. See United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). For a person to be guilty of attempted monopolization, he must (1) possess a specific intent to monopolize the relevant market with a dangerous probability of success; and (2) wilfully engage in conduct designed to achieve monopoly power improperly. California Computer Prod. v. IBM, 613 F.2d 727, 736 (9th Cir.1979).[6] Appellants contend that they have presented genuine issues for trial as to whether Kodak has, in allegedly changing a long-standing policy of supplying Kodak parts to ISOs, engaged in improper monopolization or attempted monopolization conduct.[7]
 
 
 31
 The district court found that Kodak had no duty to deal with its competitors. We agree with the district court's statement of this general rule; however, we believe that there are material issues of fact concerning whether Kodak falls within one of the exceptions to it. A monopolist may not refuse to deal with a competitor in an exclusionary attempt to impede competition without a legitimate business reason. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 105 S.Ct. 2847, 2860, 86 L.Ed.2d 467 (1985); Oahu Gas Service, Inc. v. Pacific Resources Inc., 838 F.2d 360, 368 (9th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). In the same spirit, a monopolist may not retaliate against a customer who is also a competitor by denying him access to a facility essential to his operations, absent legitimate business justifications. Otter Tail Power Co. v. United States, 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973). Appellants have presented sufficient evidence, recounted above, from which a reasonable trier of fact could find that Kodak's implementation of its policies was anticompetitive, exclusionary, and involved a specific intent to monopolize. Cf. Calculators Hawaii, Inc. v. Brandt, Inc., 724 F.2d 1332, 1339 (9th Cir.1983) (service contractor for distributor of money-handling machines produced no evidence that manufacturer who refused to sell contractor parts after manufacturer terminated distributor acted in a predatory manner or was not predominantly motivated by legitimate business purposes); Bushie v. Stenocord Corp., 460 F.2d 116, 119-21 (9th Cir.1972) (distributor of dictating equipment produced no evidence that manufacturer who terminated him was motivated by anticompetitive intent).[8]
 
 
 32
 We have already discussed Kodak's proffered business justifications in our treatment of appellants' Section 1 claim. Although there is no least restrictive alternative requirement in the context of a Section 2 claim,[9] we noted above that there exist triable issues of fact as to whether Kodak's first two proffered reasons are genuine rather than pretextual. With respect to Kodak's third reason, we observed above that it was precisely the kind of justification the theory behind Section 1 negated. The same is true under Section 2. A claim that one need not support a competitor's activities is merely a claim that one has no duty to deal with that competitor. Such a claim cannot serve as a justification for conduct which has been found to be exempted from this general rule.[10]
 
 
 33
 We have more trouble with the monopoly power (or dangerous probability of monopoly power) issue. The district court did not discuss whether the service of Kodak equipment could be a relevant market and whether Kodak might possess monopoly power or a dangerous possibility of monopoly power in that market. This court has strongly suggested that service of one company's micrographic equipment can be a relevant market under Section 2. See Dimidowich, 03 F.2d at 1480-81 n. 3 ("[A]n owner of broken [Bell & Howell] micrographic equipment is indifferent to people who can service Kodak or 3M machines. If the owner's only option is to request service from Bell & Howell or Comgraphix (depending on his location), that is obviously the market the owner faces."); Cf. Bushie, 460 F.2d at 118 n. 1, 120-21 (implying without analysis that the relevant market for servicing dictating equipment is the interbrand service market). We cannot say as a matter of law that service of Kodak equipment is not the relevant market in this case.
 
 
 34
 Assuming such a market, might Kodak have monopoly power in it? Monopoly power is the "power to control prices or exclude competition" in the relevant market. United States v. E.I. DuPont DeNemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). It is something more than the market power that is a prerequisite to liability under Section 1. See Digidyne, 734 F.2d at 1339-41. The question whether appellants have presented sufficient evidence on this issue is thus not as easily answered as the question whether they have presented sufficient evidence on market power. We conclude that the evidence presented by appellants is sufficient to withstand summary judgment. Again, there is logical appeal in Kodak's theory that it could not have monopoly power (let alone market power) in the service market since it lacks economic power in the interbrand markets. But in light of appellants' evidence we cannot say that this theory mirrors reality.
 
 
 35
 The district court improperly granted summary judgment on the Section 2 claim.
 
 
 36
 The judgment of the district court is REVERSED and the case is REMANDED.
 
 WALLACE, Circuit Judge, dissenting:
 
 37
 I cannot agree with the conclusions reached by the majority. I would affirm the judgment of the district court on both the tying and the attempted monopolization claims. On the first claim, Image Technical Services (Image Tech) has failed to raise any genuine issues of material fact with regard to Kodak's market power in the market for replacement parts. On the second claim, the record shows that Kodak has a legitimate business reason for its allegedly monopolistic behavior. Therefore, summary judgment was proper on both claims.
 
 
 38
 * I agree with the majority that Image Tech has raised triable issues as to whether Kodak's business practices constitute a tying arrangement. However, not all ties are proscribed by the antitrust laws. Rather, to establish a violation of section 1 of the Sherman Act, Image Tech must show that Kodak possesses sufficient power in the market for the tying product (parts) to appreciably restrain competition in the market for the tied product (service).
 
 
 39
 Image Tech does not contest that Kodak lacks market power in the interbrand market for copiers. Further, it is uncontested that purchasers of copiers consider costs of maintenance and repair in deciding which brand to buy. Therefore, I do not see how Kodak could have any market power in the market for replacement parts. If Kodak attempts to increase the price of replacement parts above the competitive level, new buyers will increase their estimates of the total price (including parts and service) of a Kodak copier. If some current Kodak owners are unwilling to scrap their copiers and buy new ones from other manufacturers, Kodak will gain short-run profits from the sale of parts. However, as new buyers switch brands, Kodak will lose market share in the sales of new copiers, to its long-term disadvantage.
 
 
 40
 I find persuasive Judge Posner's reasoning in the closely analogous case of Parts & Electric Motors, Inc. v. Sterling Electric, Inc., 866 F.2d 228 (7th Cir.1988) (Posner, J., dissenting) (Sterling ). In that case, Sterling tied replacement parts to purchases of new Sterling motors. The majority did not reach the question of the legality of the tie. Judge Posner did so, and concluded that Sterling's lack of power in the interbrand market for motors precluded a finding of market power in the derivative market for replacement parts:
 
 
 41
 [Plaintiff] argues that Sterling has a monopoly of replacement parts for Sterling motors. This is true in the trivial sense that only Sterling manufactures parts usable in those motors. But it would be absurd to infer from this ... that Sterling has market power, that is, power to raise the price of its parts above the price that a competitive market would charge, without losing so many sales as to make the price increase unprofitable.... Sterling could in principle exploit its "monopoly" by setting its price for replacement parts just below the point at which owners of Sterling motors would decide to scrap the motors rather than pay an exorbitant price for the parts necessary to keep them in service. But this would be a short-run game, since as soon as word got out no one would buy Sterling motors.
 
 
 42
 Id. at 236 (Posner, J., dissenting).
 
 
 43
 We accepted a similar argument in General Business Systems v. North American Philips Co., 699 F.2d 965 (9th Cir.1983) (General Business Systems ). There, Philips, a computer manufacturer, was accused of illegally tying service and warranty protection (the tying service) to parts (the tied product). Philips lacked market power in the primary interbrand small business computer market. We held that as a result, Philips could not have had any market power in the derivative markets for service and warranty protection. In affirming summary judgment for Philips, we stated: "To have attempted to impose significant pressure to buy [the tied product] by use of the tying service only would have hastened the date on which Philips surrendered to its competitors in the small business computer market." Id. at 977.
 
 
 44
 The majority acknowledges the force of this reasoning, but finds that it is too "theoretical" to serve as a basis for summary judgment. Maj. op. at 616-17. The majority's principal argument is that Image Tech has presented evidence suggesting that Kodak is exercising market power in the parts market. Moreover, the majority observes that the district court allowed only incomplete discovery on this issue, so that summary judgment would be inappropriate given the underdeveloped record.[1]
 
 
 45
 I think the majority has misconstrued the nature of Kodak's argument. Applying Judge Posner's analysis in Sterling, competition in the interbrand market dictates a simple choice: Kodak may either price parts competitively and maintain its interbrand market share, or it may price parts supercompetitively--yielding a short-term gain but over the long term destroying its share of the interbrand market. In either case Kodak is not harming competition: if it adopts the latter strategy, competitive forces will exact a heavy toll in the interbrand market, and profits gained from the short-term parts mark-ups will quickly be eclipsed. The result would be "a brief perturbation in competitive conditions--not the sort of thing the antitrust laws do or should worry about." Sterling, 866 F.2d at 236 (Posner, J., dissenting).
 
 
 46
 That Image Tech presents some evidence suggesting that Kodak is not pricing parts competitively, or that Image Tech might be able to do so given additional discovery, should not be sufficient to defeat summary judgment. At best, this would be evidence that Kodak is pursuing a self-destructive pricing strategy which lacks long-term effects upon competition. It is not evidence of true market power. Rather, because lack of power in the interbrand market necessarily precludes power in the derivative market, Image Tech must raise allegations that Kodak has interbrand market power. No amount of evidence of pricing in the derivative market can overcome this requirement.
 
 
 47
 The majority attempts to distinguish General Business Systems on its facts. The majority correctly points out that in General Business Systems, there was some factual evidence supporting a finding that Philips lacked market power in the derivative market: the higher price for the tied product was attributable to the product's greater reliability, and Philips was not the exclusive source of the tying product. General Business Systems, 699 F.2d at 977-78. However, we did not indicate that such evidence was necessary to the holding. Rather, we were persuaded by the theoretical argument--which the majority declines to accept--that any attempt to exercise power in the tying market would prove fatal in the long run; we then pointed out the factual evidence as additional support for our conclusion. See id. at 977.
 
 
 48
 I am puzzled by the majority's argument that General Business Systems is also distinguishable because Kodak has a 25 percent share of the interbrand market, whereas Philips's share was small and declining. Maj. op. at 616. The majority does not suggest why this provides a meaningful distinction. Image Tech concedes that Kodak lacks interbrand market power. Therefore, the majority's holding is tenable only if power in the interbrand market is not relevant to power in the derivative market. I cannot see how the magnitude of Kodak's interbrand market share--once it is conceded that it does not amount to market power--is relevant to any theory of this case. Although the majority states that Kodak's market share, when combined with (unspecified) "other factors," could produce power in the derivative market, maj. op. at 618, no analysis is provided to support this contention.
 
 
 49
 General Business Systems cannot be so readily distinguished. Nor can the economic logic of Kodak's position be overcome. The majority purports to reject reliance upon theoretical bases in considering the tying claim. However, a theoretical question is necessarily presented: is it possible to have power in the derivative market for replacement parts without possessing power in the primary interbrand market for copiers? The majority answers in the affirmative. However, it does so without analysis or explanation, and without argument from economic principles or legal precedents. In essence, the majority simply ignores the reasoning of General Business Systems and Judge Posner's opinion in Sterling. No one--neither Image Tech nor the majority--offers a reason why these analyses should be disregarded.
 
 
 50
 Because I am convinced that power in the primary interbrand market is a prerequisite to power in the derivative market for replacement parts, I conclude that market power has not been demonstrated and would affirm the summary judgment on the section 1 claim.
 
 II
 
 51
 I also believe that summary judgment was appropriate on the attempt-to-monopolize claim under section 2 of the Sherman Act. Kodak's policies cannot give rise to section 2 liability if they have a legitimate business justification. Oahu Gas Service, Inc. v. Pacific Resources Inc., 838 F.2d 360, 368 (9th Cir.) (Oahu Gas ), cert. denied, --- U.S. ----, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); see Aspen Skiing Co. v. Aspen Highlands Skiing Co., 472 U.S. 585, 608, 105 S.Ct. 2847, 2860, 86 L.Ed.2d 467 (1985). The burden of proof is on the plaintiff to show that there is no such legitimate justification. Calculators Hawaii, Inc. v. Brandt, Inc., 724 F.2d 1332, 1339 (9th Cir.1983).
 
 
 52
 Kodak submitted extensive and undisputed evidence of a marketing strategy based on high-quality service. Kodak alleges that independent service organizations (ISOs) such as Image Tech may provide low-quality service, which will reflect negatively on Kodak and undermine its quality-of-service strategy. According to Kodak, the tying of replacement parts to service is used to police against poor-quality service by the ISOs. To defeat a motion for summary judgment, Image Tech, as the party with the burden of proof, was required to present evidence to refute these allegations. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). It failed to do so.
 
 
 53
 In Mozart Co. v. Mercedes-Benz of North America, Inc., 833 F.2d 1342, 1350-51, 1352 (9th Cir.1987) (Mozart ), cert. denied, Y--- U.S. ----, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988), we held that an almost identical argument was sufficient to defeat liability under section 2. There, Mercedes based its reputation in part on the quality of its replacement parts. Mercedes refused to supply dealers with new cars unless the dealer purchased parts from Mercedes. Id. at 1344, 1351. Mercedes argued that this policy was used to maintain the high quality of replacement parts. We held that this tying arrangement was permissible due to the legitimate business justification of quality control. Id. at 1351, 1352; see also Drinkwine v. Federated Publications, Inc., 780 F.2d 735, 740 (9th Cir.) ("desire to control quality" held a legitimate business justification for a tying arrangement sufficient to support summary judgment on a section 2 claim), cert. denied, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986).
 
 
 54
 Image Tech argues, and the majority agrees, that summary judgment is not appropriate because Kodak's policies may in part be motivated by a desire to exclude the ISOs. However, the mere presence of monopolistic motivations is insufficient to establish liability. "Where a monopolist's [activity] is based partially on a desire to restrict competition, we determine antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct.... [T]he desire to maintain market power--even a monopolists' market power--cannot create anti-trust liability if there was a legitimate business justification for [the challenged action]." Oahu Gas, 838 F.2d at 368-69.
 
 
 55
 Image Tech also argues that Kodak's proposed justification is insufficient because strategies are available to accomplish the same objectives that pose a lesser injury to competition. A defendant's proposed business rationale cannot serve as a defense to a section 1 tying claim unless the challenged practice is the least restrictive alternative for achieving the stated goal. Mozart, 833 F.2d at 1349. Thus, the majority rightly rejects Kodak's use of the quality-control defense in the context of the section 1 claim. Maj. op. at 618. However, no such requirement exists under section 2. Any business justification--whether or not it is the least restrictive--will defeat an attempt-to-monopolize claim. Oahu Gas, 838 F.2d at 368-69 (A monopolist's duties under section 2 "arise only when there is no justification for refusing to aid a competitor." (emphasis added)); see also Mozart, 833 F.2d at 1352. Thus, the majority's suggestion--that because the quality-control defense failed under section 1, it must also fail under section 2--misconstrues the section 2 test. There is no less-restrictive alternative requirement here.
 
 
 56
 Image Tech has raised no genuine issue of material fact showing Kodak's policy to be unsupported by legitimate business judgment. While the policy may not be the least restrictive alternative, and while it may also involve in part a desire to enhance Kodak's market share in service, such circumstances are insufficient to establish liability under section 2. I would affirm the summary judgment on this claim as well.
 
 
 
 [1]
 Appellants briefly argue that Kodak's conduct is illegal under a rule of reason analysis. We do not consider this argument because appellants failed to raise it in response to Kodak's motion for summary judgment in the district court. See Animal Protection Institute of America v. Hodel, 860 F.2d 920, 927 (9th Cir.1988) (failure to raise issue below bars consideration on appeal)
 
 
 [2]
 Kodak does not dispute that its arrangement affects a substantial volume of interstate commerce in the tied product
 
 
 [3]
 Kodak estimates its share of the micrographic market to be less than twenty percent. Kodak estimates its overall market share for plain paper copiers was less than two percent in 1984 and its current share of the high-volume segment of the copier market is approximately twenty-three percent. Appellants do not dispute Kodak's assertion that it lacks market power in the interbrand markets
 
 
 [4]
 The district court permitted only very limited discovery on the market power issue. Appellants requested further discovery in their opposition to Kodak's summary judgment motion. For example, appellants requested to depose two ISO customers who allegedly would not sign accurate statements concerning Kodak's market power in the parts market. Not finding it necessary to reach the market power issue in its decision, the district court, of course, had no reason to grant this request
 
 
 [5]
 The defendant bears the burden of proving legitimate business reasons under Section 1 of the Sherman Act. Id. at 1349
 
 
 [6]
 The cases also identify the standing requirement of "causal antitrust injury." Id. Kodak does not dispute appellants' standing to bring its Section 2 claim
 
 
 [7]
 Kodak contends that appellants did not raise this argument below. From reading only appellants' Memorandum in Opposition to Kodak's Motion for Summary Judgment, one can reach this conclusion. Certainly the focus of appellants' Section 2 claim has changed on appeal. But after reading all the papers surrounding Kodak's summary judgment motion, we are not confident enough that the district court did not consider appellants' present argument to foreclose appellants from raising that argument here
 
 
 [8]
 The dissent implies that Mozart compels acceptance of Kodak's proffered quality control justification on Kodak's Section 2 claim. See Dissent at 624. However, Mozart merely held that substantial evidence supported a jury's determination that the defendant's proffered quality control justification was genuine, Mozart, 833 F.2d at 1350-51, 1352, despite the "skepticism" which "the quality control defense ... usually has been accorded," id. at 1349
 
 
 [9]
 The plaintiff also bears the burden of proving lack of legitimate business justifications in a Section 2 claim. Calculators Hawaii, 724 F.2d at 1339
 
 
 [10]
 We stress that there exists a triable issue of fact as to whether Kodak has any non-pretextual legitimate business reason for its conduct. We do not suggest, as the dissent contends, "that because the quality control defense failed under section 1, it must also fail under section 2." Dissent at 624. Likewise, the dissent's argument that the law allows a defendant to overcome a section 2 claim when he has acted in part out of a desire to exclude competition and in part for a legitimate business reason is beside the point
 
 
 [1]
 The majority also suggests that the theory outlined in Sterling and General Business Systems may not reflect the reality in this case because of "market imperfections." No evidence of market imperfections has been presented, and the majority does not identify any specific imperfections which might invalidate the theory